UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


QUINSHUN EARL WHITE,

                 Petitioner,                                 Hon. Janet T. Neff

v.                                                    Case No. 1:10-CV-1257

CINDI CURTIN,

                 Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on White's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that White's petition be **denied**.


**BACKGROUND**

        As a result of events which occurred on or about May 31, 2007, Petitioner was charged with: (1) kidnaping; (2) first degree criminal sexual conduct; and (3) possession of a firearm during the commission of a felony. (Trial Transcript, January 22, 2008, 8-9). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Charles Pelfrey**

As of May 31, 2007, Pelfrey was employed as a police officer for the City of Battle Creek Police Department. (Trial Transcript, January 23, 2008, 38-39). At approximately 4:30 a.m. that morning, Officer Pelfrey was dispatched to a general area in Battle Creek to investigate a report of gunfire. (Tr. 39). As Pelfrey was traveling to the area in question, he observed a man, Bob Maggard, running toward his vehicle, yelling and waving his arms. (Tr. 39-42). Officer Pelfrey stopped his vehicle and spoke with Maggard, who told Pelfrey that he and his girlfriend "were being held hostage" at 25 South 24th Street. (Tr. 42). Maggard stated that he had just escaped and that his captors had "shot at him and tried to kill him as he was leaving." (Tr. 42-43).

Officer Pelfrey immediately requested assistance and then proceeded to 25 South 24th Street. (Tr. 43-44). Upon arriving at this location, Pelfrey observed several men exiting the residence. (Tr. 44). Pelfrey and other officers captured these men, at which point Pelfrey returned to the residence. (Tr. 44-47). When he arrived at the residence, Pelfrey learned that three additional individuals, including a woman, Eden Graver, had also been detained. (Tr. 46-47). Soon thereafter, Pelfrey spoke with Graver, who appeared "very shaken. . .scared and excited and very frightened." (Tr. 48).

**Kevin Stansbery**

As of May 31, 2007, Stansbery was employed as a police officer for the City of Battle Creek Police Department. (Trial Transcript, January 23, 2008, 89). At approximately 4:30 a.m. that morning, Stansbery was dispatched to the vicinity of 23rd and 24th Streets to investigate a report of gunfire. (Tr. 89-90). As he was driving to this location, Stansbery heard what he thought was a

gunshot. (Tr. 90-91). A few moments later, Officer Pelfrey instructed Stansbery to proceed to 25 South 24th Street. (Tr. 90-91). Upon arriving at this location, Officer Stansbery assisted other officers detain several individuals who had exited the residence in question. (Tr. 91-94). Petitioner was one of the individuals detained and a subsequent pat down search of Petitioner's pants revealed the presence of "a plastic bag with like a white rocky substance in it." (Tr. 93-94). Based on his training and experience, Officer Stansbery believed the substance recovered from Petitioner to be crack cocaine. (Tr. 97-98). Stansbery subsequently transported Petitioner to the Calhoun County Jail. (Tr. 100-01).

**Anthony Perin**

As of May 31, 2007, Perin was employed as a police officer for the City of Battle Creek Police Department. (Trial Transcript, January 23, 2008, 109-10). At approximately 4:30 a.m. that morning, Perin was dispatched to 25 South 24th Street to assist Officer Pelfrey. (Tr. 110-11). Upon arriving at this location, Officer Perin assisted with the capture, detention, and transportation of several individuals. (Tr. 111-14).

**Craig Dingman**

As of May 31, 2007, Dingman was employed as a police officer for the City of Battle Creek Police Department. (Trial Transcript, January 23, 2008, 119-20). At approximately 4:30 a.m. that morning, Dingman was dispatched to 25 South 24th Street to investigate reports of gunfire. (Tr. 120-21). Upon arriving at this location, Officer Dingman assisted with the capture, detention, and transportation of several individuals. (Tr. 121-25). Later that morning, Dingman spoke with Bob

Maggard and Eden Graver. (Tr. 125-26). During these conversations, Dingman learned where narcotics were hidden and maintained in the residence at 25 South 24th Street. (Tr. 126, 131-32). Specifically, Maggard and Graver reported that drugs were hidden inside a fake 7-Up can, a peanut butter jar, a shoe box, and above the ceiling tiles. (Tr. 137-38). Officer Dingman communicated this information to Detective Eager. (Tr. 126, 131-32).

**Brett Weiss**

As of May 31, 2007, Weiss was employed as a police officer for the City of Battle Creek Police Department. (Trial Transcript, January 23, 2008, 139-40). On that morning, Weiss assisted in the execution of a search warrant at 25 South 24th Street. (Tr. 140). In the space above the kitchen ceiling tiles, officers discovered a cache of clear plastic baggies containing what appeared to be heroin. (Tr. 147-49, 171). Officers located a fake 7-Up can and a peanut butter jar both of which were stuffed with clear plastic baggies containing an "off-white rocky substance." (Tr. 166-68). Officers located various items used to manufacture drugs as well as firearms and ammunition. (Tr. 169-70, 172-73, 174-77). Officers also located several used condoms. (Tr. 184-85).

**Sarah Bush**

As of May 31, 2007, Bush was employed as a detective for the City of Battle Creek Police Department. (Trial Transcript, January 23, 2008, 219-20). Following the events of that early morning, Bush assisted in the execution of a search warrant at 25 South 24th Street. (Tr. 220-21). During this search, Bush located a firearm, ammunition, and three used condoms. (Tr. 221-25).

**Tara Wesseldyk**

As of May 31, 2007, Wesseldyk was employed as a crime lab specialist for the City of Battle Creek Police Department. (Trial Transcript, January 23, 2008, 233-37). On that date, Wesseldyk assisted Officer Weiss process certain evidence. (Tr. 237-38). Wesseldyk performed a test on the material recovered from Petitioner on the morning of May 31, 2007, which revealed the substance in question to be cocaine. (Trial Transcript, January 24, 2008, 6-8). Fingerprint analysis of a beer bottle recovered from the crime scene revealed the presence of Petitioner's fingerprints. (Tr. 9-23).

**Gregory Huggett**

As of May 31, 2007, Huggett was employed as a detective for the City of Battle Creek Police Department. (Trial Transcript, January 24, 2008, 51-52). On June 1, 2007, Huggett interviewed Bernard Clifton.[1] (Tr. 52).

**Stephen Hibbard**

With respect to the incidents occurring at 25 South 24th Street on May 31, 2007, Hibbard was initially charged with three counts of kidnaping and two counts of first degree criminal sexual conduct. (Trial Transcript, January 25, 2008, 5-6). Hibbard subsequently entered into a plea agreement pursuant to which he agreed to plead guilty to one count each of attempted kidnaping and third degree criminal sexual conduct and testify truthfully at Petitioner's trial, in return for which the

---

[1]  Clifton was Petitioner's co-defendant. While Detective Huggett was permitted to testify concerning the statements Clifton made during his interview, the jury was instructed to consider such as evidence against Clifton only and not Petitioner. (Tr. 55-56). Accordingly, such will not be described herein.

prosecution agreed to drop the charges with which Hibbard was originally charged. (Trial Transcript, January 24, 2008, 85-87).

As of the date in question, Hibbard was acquainted with Petitioner (aka Smack) and Bernard Clifton (aka Lucky). (Tr. 88-91). Hibbard, Petitioner, and Clifton smoked crack cocaine together "every now and then." (Tr. 91-92). As of that date, Clifton resided on South 24th Street. (Tr. 88-93). Clifton stored crack cocaine in a fake 7-Up can. (Tr. 96). Hibbard also knew Eden Graver and her boyfriend, Bob Maggard, both of whom smoked crack cocaine. (Tr. 95-99).

On the evening of May 30, 2007, Hibbard arrived at Clifton's residence at approximately 6:30 p.m. (Tr. 101-02). When Hibbard arrived, Clifton, Petitioner, and Joshua Johnson (aka Speedy) were present. (Tr. 91, 101-02). Later that evening, Hibbard overheard a conversation between Petitioner and Clifton regarding Eden Graver and Bob Maggard. (Tr. 105). Petitioner and Clifton were upset that Graver and Maggard had failed to pay them for crack cocaine they had been allowed to purchase on credit. (Tr. 105-06). The more alcohol Petitioner and Clifton consumed, the more upset they became. (Tr. 106-07). The pair later agreed that if the debt "was not paid real soon, [Clifton] was going to go over there and beat [Maggard's] ass." (Tr. 107-08).

At approximately 10:15 p.m., Petitioner, Clifton, and Hibbard traveled to Maggard's residence. (Tr. 110-16). Maggard, Eden Graver, and Joshua Johnson were all present. (Tr. 116-18). Petitioner and Clifton entered the residence and proceeded upstairs to speak with Maggard and Graver. (Tr. 116-18). Hibbard overheard the conversation taking place upstairs and could tell that matters were becoming more heated. (Tr. 118-19). Petitioner and Clifton returned downstairs a short time later, at which point Clifton instructed Maggard to "get my money" and, furthermore, that until he did so, "I'm gonna take Eden with us." (Tr. 119). Petitioner, Clifton, Johnson, and Hibbard

then exited the residence and proceeded to Hibbard's residence. (Tr. 119-20).

After the group arrived at Hibbard's residence, Johnson smoked an entire dime bag of cocaine, after which he "started gettin' strange." (Tr. 121-24). Johnson stated that he wanted to "tie Eden up." (Tr. 123-24). Clifton and Johnson then began talking about tying up Graver using tape and shoelaces. (Tr. 124-26). Graver was present for these conversations and "was scared" and "had tears comin' down from her face." (Tr. 126). Clifton and Johnson then considered killing Graver and using Hibbard's vehicle to transport her body. (Tr. 126-27). When Clifton demanded that Hibbard provide him with tape and access to his vehicle, Hibbard stated, "this is bullshit, you ain't usin' nothin', I'm outta here" and ran out of his residence. (Tr. 127-28). Immediately after exiting his residence, Hibbard "ran into" Bob Maggard. (Tr. 128). Hibbard told Maggard, "please get the man his money, this ain't no joke anymore." (Tr. 128). Maggard "took off runnin'." (Tr. 128-29).

Clifton then approached Hibbard and instructed him to accompany him back to his residence. (Tr. 129-31). Hibbard complied and the pair returned to Clifton's residence. (Tr. 129-31). Petitioner and Joshua Johnson, accompanied by Eden Graver, returned to Clifton's residence soon thereafter. (Tr. 133-36). Clifton then stated that he wanted to hunt for Maggard so that he could get his money. (Tr. 135-36). A few minutes later, Petitioner, Clifton, Hibbard, Johnson, and Graver exited the residence. (Tr. 137). Johnson approached the roadway and flagged down a vehicle. (Tr. 137-38). When the vehicle stopped, they realized that Maggard was a passenger in the vehicle. (Tr. 137-38). Petitioner and Clifton immediately began "drillin' [Maggard] about the money" in a very "hostile" manner. (Tr. 138-39). Maggard responded that he was unable to obtain the money that night and that they would have to wait until the next day for their money. (Tr. 139).

At this juncture, Maggard departed and Petitioner, Clifton, Hibbard, Johnson, and Graver all returned to Clifton's residence.  (Tr. 139-40).

A short time later, Clifton ordered Graver to perform oral sex on Hibbard.  (Tr. 142-46).  Graver complied, but after a few minutes Hibbard told Graver to "get off, I don't want it."  (Tr. 147).  Hibbard's actions greatly upset Petitioner and Clifton who instructed Johnson to "beat [Hibbard's] ass."  (Tr. 147-48).  Johnson immediately threw Hibbard to the ground and began choking him.  (Tr. 148-49).  Clifton eventually instructed Johnson to stop, at which point Hibbard asked Clifton, "please let me go home, I don't want any more of this, just let me leave."  (Tr. 149).  Clifton denied Hibbard's request, stating "until my business is done, you can't leave."  (Tr. 149).  Clifton then instructed Hibbard to "sit in a corner chair."  (Tr. 149).

Hibbard complied with this request, but later attempted to exit the residence, at which point Petitioner struck Hibbard in the jaw.  (Tr. 149-50).  Hibbard returned to his chair and fell asleep.  (Tr. 150).  When Hibbard later awoke, he realized that Graver was again performing oral sex on him, at Clifton's direction.  (Tr. 150).  Hibbard later observed Clifton "just beatin' the crap out of" Bob Maggard and threatening to kill him.  (Tr. 152-55).  Clifton also told Maggard that "Eden's my bitch now."  (Tr. 156).  Clifton then threatened to kill Eden Graver while Petitioner beat Maggard.  (Tr. 156-57).  Hibbard later heard gunfire soon after which the police arrived.  (Tr. 158-64).

**Rinehart Pope**

Pope testified that he was employed as a detective sergeant with the Michigan State Police assigned to the firearms and tool marks identification unit at the Lansing forensic science

laboratory. (Trial Transcript, January 25, 2008, 117). Pope performed ballistics tests on a bullet and weapon recovered from the crime scene. (Tr. 118). The results of these tests revealed that the bullet in question was not fired by the weapon in question. (Tr. 118-20).

**Amelia Proctor**

Proctor testified that she was employed as a forensic scientist for the Michigan State Police, performing various tasks including analyzing and processing biological evidence and performing DNA tests. (Trial Transcript, January 25, 2008, 125). Proctor was permitted to testify as an expert in the area of DNA analysis. (Tr. 125-27). Proctor performed DNA analysis on six condoms recovered from the crime scene. (Tr. 128). Proctor obtained sufficient samples from each of the six condoms and excluded Eden Graver, Bernard Clifton, Stephen Hibbard, and Joshua Johnson as donors of all such samples. (Tr. 128-35). Proctor discerned Petitioner's DNA on five of the six condoms. (Tr. 135-43). Several of these particular condoms also contained the DNA sample of an "unidentified female donor." (Tr. 135-36).

**Joshua Johnson**

On the night of May 30, 2007, Johnson was present at Bernard Clifton's residence, along with Clifton, Petitioner, and Stephen Hibbard. (Trial Transcript, January 24, 2008, 140; Trial Transcript, January 25, 2008, 171-78). At some point in the evening, Bob Maggard and Eden Graver arrived, after which an argument ensued between Maggard and Petitioner regarding Maggard's inability to repay a debt to Petitioner. (Tr. 178-81). Shortly thereafter, Johnson, Petitioner, Clifton, Hibbard, and Graver traveled to the apartment Johnson shared with Hibbard. (Tr. 168-69, 181-83).

After arriving at this location, Johnson smoked a dime bag of crack cocaine. (Tr. 184). Shortly thereafter, Petitioner pointed a firearm at Graver's head and informed her that "you our bitch now." (Tr. 185-88). Petitioner then order Graver, at gunpoint, to perform oral sex on Johnson. (Tr. 185-88). Graver complied with Petitioner's demand after which the entire group returned to Clifton's residence. (Tr. 189-91). At some point later that evening, Bob Maggard returned and informed Petitioner that he was unable to obtain his money. (Tr. 191-93). Petitioner responded by beating Maggard. (Tr. 193, 201). Petitioner also stated to Maggard, "Bob, she's our bitch now" referring to Eden Graver. (Tr. 196). Hibbard later indicated that he was going to depart at which point Johnson was instructed by Petitioner, at gunpoint, to "grab" Hibbard. (Tr. 194-95). Johnson complied and grabbed Hibbard, telling him, "sit your ass down." (Tr. 194-95). Petitioner later ordered Graver, at gunpoint, to perform oral sex on Hibbard and Johnson. (Tr. 197-200). Graver complied. (Tr. 197-200). Sometime later, Petitioner instructed Maggard to "dance, motherfucker" at which point Petitioner began firing his weapon at Maggard's feet. (Tr. 203-04). Maggard responded by running out of the residence. (Tr. 204).

**Scott Eager**

As of May 31, 2007, Eager was employed as a detective with the Battle Creek Police Department. (Trial Transcript, January 29, 2008, 66). On this date, Eager obtained a warrant authorizing a search of 25 South 24th Street. (Tr. 66). Eager also participated in the subsequent search of this location. (Tr. 67). During this search, officers discovered several items used to manufacture and distribute drugs. (Tr. 77-78, 85-90). Officers also discovered a peanut butter jar and 7-Up can in which drugs were stored. (Tr. 78).

**Eden Graver**[2]

As of May 30, 2007, Graver was living with Bob Maggard and John Pram. (Trial Transcript, January 29, 2008, 97). Graver was also acquainted with Stephen Hibbard and Joshua Johnson. (Tr. 104-05). As of this date, Graver and Maggard were both addicted to crack cocaine which they purchased from Petitioner and Bernard Clifton. (Tr. 98-104). Graver was aware that Maggard owed money to Clifton and/or Petitioner. (Tr. 107-08).

On the evening of May 30, 2007, Graver and Maggard were at home when Petitioner, Clifton, Johnson, and Hibbard arrived. (Tr. 110). Graver accompanied Clifton and Petitioner upstairs where they began arguing with Maggard about the money he owed. (Tr. 111-12). Clifton and Petitioner were "very angry" and the argument became "quite heated." (Tr. 113). Clifton and Petitioner threatened Maggard and informed him that he had until the following morning to pay the debt. (Tr. 113-15). Clifton and Petitioner also informed Maggard that until he paid the debt, Graver "is coming with us." (Tr. 115-16). Graver "was extremely terrified" because Clifton was brandishing a weapon which she believed he would use. (Tr. 117-20).

Petitioner, Clifton, Johnson, Hibbard, and Graver proceeded to Hibbard's residence after which Johnson smoked some crack cocaine. (Tr. 122-24). Johnson and Clifton then began

---

[2] The Attorney General requests that "this Court not refer to the victim by her last name in its opinion given the sexual nature of her testimony and that the fact that the opinion will be available to the general public." While the Court understands, and is not unsympathetic to, the sentiments underlying this request, the undersigned is not persuaded that such is appropriate. The Attorney General's request requires the Court to weigh the interests of crime victims to not be unduly embarrassed by revelation of the crimes to which they were subjected against the public's interest in maintaining a complete and accurate record of criminal proceedings and other public matters. While this balance may weigh in favor of such a request where the victim is a minor or the facts particularly disturbing, as neither circumstance is present in this instance, the undersigned declines Respondent's request. While the Court sympathizes with the embarrassment suffered by any crime victim whose experiences become part of the public record, mere embarrassment is not a sufficient basis to accord crime victims anonymity in the public record. The Court further notes that Graver is referenced by her first and last name in both the trial transcripts and the opinion by the Michigan Court of Appeals, both of which are available to the public. Thus, the Court fails to discern what practical benefit would be achieved by granting Respondent's request.

discussing what they intended to do with Graver.  (Tr. 126-28).  The pair initially discussed killing

Graver.  (Tr. 129-34).  Johnson later asked Graver to perform oral sex on him, at which point

Petitioner, who was brandishing a weapon, ordered Graver, "do what you do."  (Tr. 135-36).  Graver

complied and performed oral sex on Johnson, after which Petitioner, Clifton, Johnson, Hibbard, and

Graver proceeded to Clifton's residence.  (Tr. 135-37).  After arriving at Clifton's residence, Graver

was ordered by Clifton to perform oral sex on Hibbard.  (Tr. 140-43).

   Petitioner, Clifton, Johnson, Hibbard, and Graver later exited the residence to hunt

for Maggard.  (Tr. 150-51).  Soon thereafter, a vehicle in which Maggard was riding stopped outside

Clifton's residence.  (Tr. 150-51).  Maggard informed Petitioner and Clifton that he was unable to

obtain the requested money, at which point Petitioner grabbed Graver by the neck and directed her

to return to Clifton's residence.  (Tr. 151-53).  Maggard, Clifton, Johnson, and Hibbard also returned

to Clifton's residence.  (Tr. 153).  Some time later, Petitioner approached Graver with his pants

down and ordered her to "lick the side of his penis."  (Tr. 157-59).  Graver did not believe she could

decline and, therefore, "did exactly what [Petitioner] told [her] to do."  (Tr. 159).  Petitioner and

Clifton later severely beat Graver and Maggard, after which Petitioner ordered Graver to perform

oral sex on Johnson.  (Tr. 159-63).  Graver, believing she had no choice, complied with Petitioner's

order.  (Tr. 163-64).  Soon thereafter, Clifton directed Maggard to "dance" and began firing his

weapon at Maggard's feet.  (Tr. 165-67).  Maggard was able to escape the residence and run away.

(Tr. 167-68).  After Maggard escaped, Petitioner ordered Graver to perform oral sex on Hibbard.

(Tr. 168-74).  Graver, believing she would be killed if she did not comply, performed oral sex on

Hibbard.  (Tr. 174-75).  The police arrived at Clifton's residence soon thereafter.  (Tr. 179-80).

   Following the presentation of evidence, the jury found Petitioner guilty of kidnaping,

first degree criminal sexual conduct, and possession of a firearm during the commission of a felony. (Trial Transcript, January 31, 2008, 4). Petitioner was sentenced to serve concurrent sentences of 15-30 years on the kidnaping and criminal sexual conduct convictions. (Sentencing Transcript, March 17, 2008, 13-14). Petitioner was also ordered to serve two years in prison on the firearms conviction, to be served consecutively to his other sentences. (Tr. 13-14). Petitioner appealed his conviction in the Michigan Court of Appeals, asserting the following claims:

> I. The prosecutor violated Appellant's due process rights by eliciting, in the prosecutor's case-in-chief, the fact that Appellant refused to make a statement and asked for a lawyer after receiving *Miranda* rights; furthermore, defense trial counsel was constitutionally ineffective in failing to object.

> II. The prosecutor violated Appellant's due process rights in closing argument by unfairly commenting on Appellant's failure to produce evidence; furthermore, defense trial counsel was constitutionally ineffective in failing to object.

> III. The trial court violated Appellant's constitutional right to a unanimous verdict on the kidnapping charge where the trial court submitted a single count involving both alleged complainants to the jury and instructed the jury that the prosecutor had to prove, among other elements, that Appellant knowingly restrained "another person"; furthermore, defense trial counsel was constitutionally ineffective in failing to object.

> IV. Due process requires vacating the trial court's assessment for attorney fees where the trial court failed to adequately consider Appellant's foreseeable indigency.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. White*, Case No. 284711, Opinion (Mich. Ct. App., Dec. 8, 2009). Asserting issues I-III above, Petitioner

later moved in the Michigan Supreme Court for leave to appeal this determination. The court denied

Petitioner's request, stating that "we are not persuaded that the questions presented should be

reviewed by this Court." *People v. White*, Case No. 140459, Order (Mich., Apr. 27, 2010). On

December 17, 2010, Petitioner initiated the present action in which he asserts claims I-III above.


## STANDARD OF REVIEW

White's petition is subject to the provisions of the Antiterrorism and Effective Death

Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive

standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that

15

adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state

court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.**         **Reference to Petitioner's post-*Miranda* Silence**

During the direct examination of Officer Kevin Stansbery, the following exchange occurred, concerning Stansbery's actions regarding the apprehension and arrest of Petitioner:

| Prosecutor: | Do you remember anything that Mr. White was wearing that would have been - I guess - unique, or that may have caught your attention? |
|---|---|
| Stansbery: | I do not, sorry. |
| Prosecutor: | Anything else that you would have done in regard to this incident, Officer Stansbery? |
| Stansbery: | Based trans - I read him his *Miranda* rights at the police station. |

| | |
|---|---|
| Prosecutor: | That would be Quinshun White? |
| Stansbery: | Yes. |
| Prosecutor: | And you read him his *Miranda* rights, and did he respond to you in any fashion as to whether he had an understanding of what those rights were? |
| Stansbery: | He said that he wanted a lawyer. |
| Prosecutor: | And that was the end of anything at that point? |
| Stansbery: | Yes |
| Prosecutor: | All right.  Did that cover, then, your involvement in this matter? |
| Stansbery: | I then took him to the Calhoun County Jail, and collected his clothing, and that was the extent of it. |

(Trial Transcript, January 23, 2008, 100-01).

Relying on *Doyle v. Ohio*, 426 U.S. 610 (1976), Petitioner asserts that Officer Stansbery's testimony regarding his request for counsel after being informed of his *Miranda* rights violated his right to a fair trial as protected by the Due Process Clause of the Fourteenth Amendment.

In *Doyle v. Ohio*, 426 U.S. 610 (1976), Jefferson Doyle and Richard Wood were charged with selling marijuana.  *Id.* at 611.  Doyle and Wood each testified at their respective trials offering a version of events that differed from the version presented by the prosecution's witnesses. *Id.* at 611-13.  On cross-examination, the prosecution asked Doyle and Wood why they had not shared with police, after being arrested and informed of their *Miranda* rights, the version of events to which they testified at trial.  *Id.* at 613-14.  Objections to this line of questioning were rejected by

the state courts on the ground that "[t]his was not evidence offered by the state in its case in chief as confession by silence or as substantive evidence of guilt but rather cross examination of a witness as to why he had not told the same story earlier at his first opportunity." *Id.* at 615-16.

Doyle and Wood were subsequently convicted, but the United States Supreme Court reversed the convictions. *Doyle*, 426 U.S. at 618-20. As the Court observed, "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618. Accordingly, the Court held that "the use for impeachment purposes of [a criminal defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id.* at 619. The Court continues to adhere to the rule that the Constitution prohibits "the evidentiary use" of a criminal defendant's post-*Miranda* silence. *See, e.g., Wainwright v. Greenfield*, 474 U.S. 284 (1986); *Greer v. Miller*, 483 U.S. 756 (1987); *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

With respect to the consideration of errors occurring during the course of a criminal prosecution, the Supreme Court has long recognized a distinction between "structural defects" and "trial error." *Brecht*, 507 U.S. at 629-30; *see also*, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). Trial errors are those that occur "during presentation of the case to the jury" and whose effect can "be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless." *Gonzalez-Lopez*, 548 U.S. at 148. On the other hand, structural errors "defy analysis by harmless error standards because they affec[t] the framework within which

the trial proceeds and are not "simply an error in the trial process itself." *Id.* at 148-49. The Supreme Court has held that "*Doyle* error fits squarely into the category of constitutional violations which we have characterized as 'trial error.'" *Brecht*, 507 U.S. at 629-30.

In the context of a petition for writ of habeas corpus, relief based on an alleged "trial error" is warranted only if the error in question "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 638; *see also*, *Fry v. Pliler*, 551 U.S. 112, 116-22 (2007) (in the context of a habeas corpus action brought pursuant to 28 U.S.C. § 2254, a trial error is considered harmless "unless it had substantial and injurious effect or influence in determining the jury's verdict"). To satisfy this standard, Petitioner must establish that he suffered "actual prejudice" as a result of the alleged error. *Brecht*, 507 U.S. at 637. Relevant to this inquiry is "[t]he weight of the evidence presented at trial showing [Petitioner's] guilt and the number of references made by the prosecutor regarding [Petitioner's] post-*Miranda* silence." *Westberg v. Palmer*, 489 Fed. Appx. 883, 888 (6th Cir., July 23, 2012) (citing *Brecht*, 507 U.S. at 639). The burden to establish that the alleged error is harmless rests with the government. *Jaradat v. Williams*, 591 F.3d 863, 869 (6th Cir. 2010). Moreover, "if the court is in grave doubt about whether the error had a substantial effect on the jury, then the error is not harmless." *Id.*

Even if the Court assumes that the challenged conduct violated Petitioner's rights under *Doyle*, the Court harbors no doubt that such error was harmless. As the Michigan Court of Appeals observed:

> The prosecutor did not expand upon [Petitioner's] silence or request [for] counsel during the remainder of the police witness' examination. The prosecutor did not raise the issue of [Petitioner's] silence or request for counsel during closing arguments, and never implied [Petitioner's] guilt from his silence or request for counsel.

Further, [Petitioner] never testified, so the testimony regarding silence was not used for impeachment purposes. Additionally, the trial court instructed the jury that defendants do not have to testify, and that they are presumed innocent. . .And, there was substantial evidence to support the jury's verdict without the improper testimony.

*People v. White*, Case No. 284711, Opinion at 2 (Mich. Ct. App., Dec. 8, 2009).

In sum, the challenged testimony was isolated and the prosecutor made no subsequent reference to such. Furthermore, the evidence against Petitioner was overwhelming. Accordingly, the Court concludes that the alleged error did not have a substantial and injurious effect or influence in determining the jury's verdict in this matter. Thus, this claim raises no issue on which habeas relief may be granted.

## II.         Reference to Petitioner's Failure to Testify

After a lengthy closing argument in which he discussed in detail the evidence presented at trial and why such supported a finding of guilt, the prosecutor made the following statements:

In the beginning, the defense attorney, in fact I think it was Mr. Webb, said you know what? Reasonable doubt comes from different things. It comes from lack of evidence,[3] but there is no evidence that was presented by the defense or lack of evidence. Well, is there a lack of evidence? No. No, you know what, there really isn't a lack of evidence.

(Trial Transcript, January 30, 2008, 109-10).

Petitioner asserts that these comments constituted an improper commentary on his

---

[3] In his opening statement, counsel for Petitioner's co-defendant asserted that "after you do hear the evidence in this case, the lack of evidence in this case" a not guilty verdict would be mandated. (Trial Transcript, January 23, 2008, 37-38).

failure to testify and, therefore, violated his right to a fair trial. In support of this claim, Petitioner relies on *Griffin v. California*, 380 U.S. 609 (1965), in which the Supreme Court announced that "the Fifth Amendment. . .forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615. As the Court later held, violations of the *Griffin* rule constitute trial errors subject to harmless error analysis. *See*, *e.g.*, *United States v. Hasting*, 461 U.S. 499, 507-09 (1983).

The precise analysis applicable to Petitioner's claim is, somewhat surprisingly, not immediately apparent. Petitioner argues that he is entitled to relief because the prosecutor's comments violate the rule announced in *Griffin* and, by extension, are not harmless. The Michigan Court of Appeals, however, analyzed the claim as a question of "prosecutorial misconduct." As discussed above, to obtain relief based on a *Griffin* violation, Petitioner must not only establish that the prosecutor commented on his silence, he must also establish that such error "had substantial and injurious effect or influence in determining the jury's verdict." On the other hand, to obtain relief based on a claim of prosecutorial misconduct, Petitioner must establish that the comments in question were improper and, moreover, that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

While these two particular analytical frameworks may appear quite similar, they are nevertheless distinct inquiries vindicating different, albeit related, rights, namely the right to remain silent and the right to a fair trial. This matter is further complicated by the fact that the Sixth Circuit recently denied, in the context of a state prisoner seeking habeas relief in federal court, a *Griffin* claim by means of an analysis which appears to have combined the harmless error and prosecutorial

22

misconduct analyses. *See Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013). The Court, therefore, will analyze this particular claim under both the prosecutorial misconduct and the harmless error frameworks. In so doing, the Court presumes that the prosecutor's comment that "there is no evidence that was presented by the defense" runs afoul of the rule announced in *Griffin*.

First, even assuming the prosecutor's statement violates *Griffin*, the Court finds that such was harmless. The statement in question, while improper, did not constitute a direct reference on Petitioner's right to remain silent or failure to testify, but was instead a more general reference to the defense's failure to present evidence. Moreover, the comment in question was isolated and as previously noted, the jury was instructed that Petitioner was not obligated to testify and must be presumed innocent. Finally, the evidence against Petitioner was overwhelming. Thus, the Court concludes that the challenged comment did not have a substantial and injurious effect or influence in determining the jury's verdict in this matter.

To establish that he is entitled to relief based upon a claim on prosecutorial misconduct, Petitioner must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)) (when a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor").

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis. The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). If such is the

23

case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759. When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

While the comments in question were improper, evaluation of the relevant factors reveals that relief is not appropriate. The challenged comments were isolated and were unlikely to have mislead the jury or prejudiced Petitioner. Moreover, the comments do not appear to have been a deliberate attempt to comment on Petitioner's failure to testify, but instead appear to have been a response to comments made by defense counsel in his opening statement. Finally, the evidence against Petitioner was quite substantial.

The Michigan Court of Appeals found that the comments in question did not constitute prosecutorial misconduct as such did not deprive Petitioner of the right to a fair trial. The Court concludes that this determination was neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. Finally, as discussed above, the Court concludes that while the prosecutor's comments violated the *Griffin* rule, such were harmless and, therefore, cannot form the basis for habeas relief. Accordingly, the undersigned recommends that this claim be denied.

**III.          Unanimous Verdict**

The evidence presented at trial may very well have supported charging Petitioner with two separates counts of kidnaping, one each for kidnaping Eden Graver and Bob Maggard. Petitioner was charged, however, with only one count of kidnaping. As the trial judge explained it to the jury at the outset of trial, "it's alleged in count one that [Petitioner] did knowingly restrain Eden Graver and Robert Maggard with the intent to hold that person in involuntary servitude." (Trial Transcript, January 22, 2008, 8). With respect to this particular offense, the trial judge instructed the jury as follows:

> It's alleged that the defendant committed the crime of kidnaping, and again, to prove that charge, the prosecution must prove each of the following elements beyond a reasonable doubt. First, that the defendant knowingly restrained another person, and again, restrained means to restrict the person's movements or to confine the person so as to interfere with that person's liberty without the person's consent or without legal authority. And again, the restraint does not have [to] exist for any particular length of time, and it may be related or incidental to the commission of other criminal acts. And second, as it relates to Mr. White, by doing so, the defendant must have intended to do, to hold that person in involuntary servitude.

(Trial Transcript, January 30, 2008, 161-62).

As previously noted, the jury found Petitioner guilty of kidnaping. Petitioner argues, however, that given the wording of the jury instruction above there exists a "real likelihood" that some jurors found him guilty of kidnaping Eden Graver, but not Bob Maggard, whereas other jurors may have found him guilty of kidnaping Bob Maggard, but not Eden Graver. Thus, Petitioner argues, it cannot be determined with certainty that the jury unanimously found him guilty of kidnaping either Graver or Maggard. Petitioner asserts that the failure by the trial court to properly instruct the jury denied him the right to be convicted only by unanimous jury verdict.

The Supreme Court long ago held that to secure a conviction in a federal criminal trial, a unanimous jury verdict was required. *See Andres v. United States*, 333 U.S. 740, 748 (1948) ("[u]nanimity in jury verdicts is required where the Sixth and Seventh Amendments apply"). With respect to criminal trials conducted in state court, however, the Court has reached a different conclusion. To better understand this particular issue, it may be helpful to briefly examine certain of the Supreme Court's decisions concerning state laws regarding jury size and unanimity.

In *Duncan v. State of Louisiana*, 391 U.S. 145 (1968), Duncan was charged in state court with simple battery, a misdemeanor offense. *Id.* at 146. While the Sixth Amendment to the United States Constitution provided that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . .," U.S. Const. amend. VI, then existing Louisiana law provided that jury trials were authorized only in cases in which "capital punishment or imprisonment at hard labor may be imposed." *Duncan*, 391 U.S. at 146. Accordingly, Duncan's request for a trial by jury was rejected. *Id.* Duncan was convicted following a bench trial and the state appellate courts rejected his claim that he was entitled to trial by jury. *Duncan*, 391 U.S. at 146-47. The Supreme Court agreed to hear the matter.

In examining whether the right to jury trial articulated in the Sixth Amendment should be extended, via the Fourteenth Amendment, to criminal trials conducted in state courts, the *Duncan* Court articulated what it considered to be the fundamental purpose of a jury trial:

> A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against

26

arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power - a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. The deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and must therefore be respected by the States.

*Duncan*, 391 U.S. at 155-56 (internal citations omitted).

Accordingly, the Supreme Court reversed Duncan's conviction, stating:

Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which - were they to be tried in a federal court - would come within the Sixth Amendment's guarantee. Since we consider the appeal before us to be such a case, we hold that the Constitution was violated when [Duncan's] demand for jury trial was refused.

*Duncan*, 391 U.S. at 149-54 (internal citations omitted).

Two years later, in *Williams v. Florida*, 399 U.S. 78 (1970), the Court, having imposed on the states the Sixth Amendment's trial by jury requirement, was called upon to determine whether a state court criminal conviction, imposed by a jury of six individuals, violated the Constitution. The *Williams* Court held that while "the Fourteenth Amendment guarantees a right to trial by jury in all criminal cases that - were they to be tried in a federal court - would come within

the Sixth Amendment's guarantee," such did not require "trial by exactly 12 persons." *Williams*, 399

U.S. at 86. The Court observed that the requirement at common law that a jury be composed of 12

people was an "historical accident" which "cannot be regarded as an indispensable component of the

Sixth Amendment." *Id.* at 86-101.

The Court subsequently confronted, in *Apodaca v. Oregon*, 406 U.S. 404 (1972), the

issue whether "conviction of [a] crime by a less than unanimous jury violates the right to trial by jury

in criminal cases specified by the Sixth Amendment and made applicable to the States by the

Fourteenth" Amendment. *Id.* at 405-06. Robert Apodaca, Henry Cooper, Jr., and James Madden

had been convicted of assault with a deadly weapon, burglary in a dwelling, and grand larceny by

twelve person juries in Oregon state court. *Apodaca*, 406 U.S. at 405-06. Under then existing

Oregon law, a unanimous jury verdict was required to convict of first degree murder, otherwise "ten

members of the jury may render a verdict of guilty." *Id.* at 406 n.1. Apodaca, Madden, and Cooper

had all been convicted of jury votes of 11-1 or 10-2. *Apodaca*, 406 U.S. at 405-06.

The *Apodaca* Court, like previous Courts, focused on the values served by a jury trial.

In this regard, the Court stated:

> Our inquiry must focus upon the function served by the jury in
> contemporary society. As we said in *Duncan*, the purpose of trial by
> jury is to prevent oppression by the Government by providing a
> 'safeguard against the corrupt or overzealous prosecutor and against
> the complaint, biased, or eccentric judge.' 'Given this purpose, the
> essential feature of a jury obviously lies in the interposition between
> the accused and his accuser of the commonsense judgment of a group
> of laymen . . .' A requirement of unanimity, however, does not
> materially contribute to the exercise of this commonsense judgment.
> As we said in *Williams*, a jury will come to such a judgment as long
> as it consists of a group of laymen representative of a cross section of
> the community who have the duty and the opportunity to deliberate,
> free from outside attempts at intimidation, on the question of a

defendant's guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where nonunanimous juries will convict or acquit. But in either case, the interest of the defendant in having the judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served.

*Apodaca*, 406 U.S. at 410-11 (internal citations omitted).

Accordingly, the Court concluded that the Constitution did not invalidate convictions obtained in state court by less than unanimous verdicts. *Id.* at 406.[4] Aside from the comment in a concurring opinion that "a system employing a 7-5 standard. . .would afford me great difficulty," *Apodaca*, 406 U.S. at 365 (Blackmun, J., concurring), the *Apodaca* and *Johnson* Courts offered scant insight into whether there exists a departure from unanimity so great as to invalidate the decision of a 12-person jury. Several years later, the Court was, not surprisingly, presented with a case challenging the conviction of a man found guilty by the less than unanimous verdict of a six person jury. *See Burch v. Louisiana*, 441 U.S. 130 (1979).

Daniel Burch was charged with "the exhibition of two obscene motion pictures." *Id.* at 132. Burch was tried before a six-person jury which voted 5-1 to convict, an outcome permitted under then existing Louisiana law. *Id.* at 131-32. Burch appealed his convictions, without success, in the Louisiana state courts. *Id.* at 132-33. The Supreme Court overturned Burch's convictions on the ground that "conviction by a nonunanimous six-member jury in a state criminal trial for a nonpetty offense deprives an accused of his constitutional right to trial by jury." *Burch*, 441 U.S.

---

[4] In a companion case decided the same day as *Apodaca*, the Court rejected the argument, by a Louisiana man convicted by a jury vote of 9 to 3, that "in order to give substance to" the right to be presumed innocent unless proved guilty beyond a reasonable doubt the Constitution requires a unanimous jury verdict in all criminal cases. *See Johnson v. Louisiana*, 406 U.S. 356, 357-65 (1972).

at 134. Specifically, the Court observed:

> We thus have held that the Constitution permits juries of less than 12 members, but that it requires at least 6. And we have approved the use of certain nonunanimous verdicts in cases involving 12-person juries. These principles are not questioned here. Rather, this case lies at the intersection of our decisions concerning jury size and unanimity. As in *Ballew*,[5] we do not pretend the ability to discern *a priori* a bright line below which the number of jurors participating in the trial or in the verdict would not permit the jury to function in the manner required by our prior cases. But having already departed from the strictly historical requirements of jury trial, it is inevitable that lines must be drawn somewhere if the substance of the jury trial right is to be preserved. Even the State concedes as much. This line-drawing process, "although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little." However, much the same reasons that led us in *Ballew* to decide that use of a five-member jury threatened the fairness of the proceeding and the proper role of the jury, lead us to conclude now that conviction for a nonpetty offense by only five members of a six-person jury presents a similar threat to preservation of the substance of the jury trial guarantee and justifies our requiring verdicts rendered by six-person juries to be unanimous.

*Burch*, 441 U.S. at 137-38 (internal citations omitted).

Aside from the requirement, articulated by the *Burch* Court, that convictions imposed by six-person juries be unanimous, the Supreme Court has never held that the Constitution is offended by convictions obtained in state courts by less than unanimous verdicts. *See McDonald v. City of Chicago*, 130 S.Ct. 3020, 3035 n.14 (2010); *see also*, *United States v. Turrietta*, 696 F.3d 972, 983 (10th Cir. 2012). As Petitioner was tried before a jury of twelve individuals, (Trial Transcript, January 22, 2008, 4-6; Trial Transcript, January 30, 2008, 168-69), he enjoys no federal constitutional right to be convicted by only a unanimous jury. The State of Michigan, however, does

---

[5] In *Ballew v. Georgia*, 435 U.S. 223 (1978), the Court held that a criminal trial before a five-member jury deprived Bellew of his constitutionally protected right to trial by jury.

require that a criminal conviction be obtained by unanimous verdict. *See* Mich. Court Rule 6.410(B). As is well recognized, however, this Court cannot grant relief based upon a violation of state law. *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging violations of the Constitution, laws, or treaties of the United States).

Despite the requirement under Michigan law that a criminal jury's verdict be unanimous, the Michigan Court of Appeals nonetheless rejected Petitioner's claim. When the jury returned its verdict, the trial judge read the verdict form which stated, "In People of the State of Michigan versus Quinshun White, as to count one, we find the defendant guilty of kidnaping Eden Graver *and* Robert Maggard." (Trial Transcript, January 31, 2008, 4) (emphasis added). As the Michigan Court of Appeals concluded, the conclusion that Petitioner kidnaped *both* Eden Graver and Robert Maggard eliminated any doubt as to whether the jury's verdict was unanimous. *People v. White*, Case No. 284711, Opinion at 4-6 (Mich. Ct. App., Dec. 8, 2009) ("[i]t can be deduced clearly from the jury's verdict that White was [properly] convicted of kidnaping, because the jury unanimously concluded that he knowingly restrained both Graver and Maggard").

In sum, the conclusion by the Michigan Court of Appeals that the jury verdict in this matter was unanimous was not based on an unreasonable determination of the relevant facts. Moreover, as discussed above, even if it is assumed that the jury's verdict in this matter was not unanimous, the result is the same as such does not violate clearly established law as established by the United States Supreme Court. Accordingly, this claim raises no issue on which habeas relief may be granted.

**IV.**        **Ineffective Assistance of Counsel**

Finally, Petitioner claims that he is entitled to relief because his trial attorney failed to object to the alleged errors described in the preceding sections. Specifically, Petitioner faults his trial counsel for: (1) failing to object to Officer Stansbery's testimony concerning Petitioner's post-*Miranda* silence; (2) failing to object to the prosecutor's comment in closing argument regarding the defense's failure to present evidence; and (3) failing to request that the trial judge properly instruct the jury with respect to the unanimity requirement.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The issue is whether counsel's

representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).

Even if the Court assumes that counsel rendered deficient performance, Petitioner cannot establish that he was prejudiced by such. The testimony and comments to which counsel failed to object were isolated and had no discernable or prejudicial impact in this matter. Moreover, as the Michigan Court of Appeals concluded, Petitioner cannot establish that he suffered prejudice as a result of such alleged errors. *People v. White*, Case No 284711, Opinion at 4 (Mich. Ct. App., Dec. 8, 2009). With respect to counsel's failure to request an appropriate unanimity instruction, the

Michigan Court of Appeals rejected Petitioner's claim on the ground that he could not demonstrate that he was prejudiced by counsel's shortcoming. As the court stated:

> the failure to provide a specific unanimity instruction was not outcome determinative where the record reflects that the jury unanimously found that defendant kidnaped both victims. There was no reasonable probability that the outcome at trial would have been different but for trial counsel's alleged errors in failing to request specific unanimity instructions.

*People v. White*, Case No 284711, Opinion at 6 (Mich. Ct. App., Dec. 8, 2009).

The Court concludes that the denial of these claims by the Michigan Court of Appeals was neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, the undersigned recommends that these claims be denied.


## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that White's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

<div style="margin-left:40%">

Respectfully submitted,

</div>

Date:  May 15, 2013

<div style="margin-left:40%">

 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge

</div>